DECISION
Plaintiff appeals the real market value of commercial property identified as Account 0132504 (subject property) for the 2009-10 tax year. A telephone trial was held on January 27, 2011. David Carmichael, Attorney at Law, appeared on behalf of Plaintiff. Paul Schaffner (Schaffner), MAI, and Jason Merwin (Merwin), manager for Plaintiff, testified on behalf of Plaintiff. David W. Sohm (Sohm), Registered Appraiser 3, Lane County Department of Assessment and Taxation, appeared and testified on behalf of Defendant.
 I. STATEMENT OF FACTS
The parties agree that the subject property includes an "irregularly shaped parcel of land" totaling 5.63 acres or 245,243 square feet located south of Interstate 105 in Springfield, Oregon. (Ptf's Ex 1 at 3.) Improvements to the subject property include Phase I (begun in 2007 and completed in 2008) and II (completed in 2008) of the I-105 secure storage project, including "11 separate buildings one of which is a combination of storage units, manager's office and apartment." (Id. at 7, 8.) "The gross building area of the entire project is 85,095 square feet, of which 83,172 square feet involves the mini storage buildings. The net rentable area of 78,050 square feet." (Id.) *Page 2 
Schaffner and Sohm both testified that the subject property is in a fairly favorable location because it is located near Interstate 105. Schaffner, however, testified that most people want a mini storage unit near their home or business, so the location is only a slight benefit. Sohm testified that project abuts the Interstate 105 freeway and, therefore, enjoys exposure to a high traffic area. (Def's Ex A at 5.)
Schaffner testified that the subject property has never been listed for sale. He testified that he thinks the owner would have sold the subject property at his appraised value ($3,650,000) "in a heartbeat," but it would be impossible to sell the subject property at that value in the current market. Schaffner testified that Phase I of the subject property has been available for rent since 2007; Phase II was not built until 2008. Sohm testified that buildings G, H, I, J, and K (about 20 percent of the subject property's units, based on square feet) were all added in 2008; he testified that there were other buildings added in 2008. (See Ptf's Ex 1 at 7.)
Schaffner testified that the market for mini warehouses in the Springfield area is overbuilt. He testified that, at the time Plaintiff began constructing the subject mini-warehouse complex, there was no way to anticipate how overbuilt the market would be by January 1, 2009. Merwin testified that, when the owners of the subject property were considering the project, they surveyed owners of other units in the area and found out that occupancy rates were in the "mid-to high 90s."
A. Excess Land
Schaffner testified that there is a "large area of gravel fill" (excess land) located on the property. The total area of the excess land is 61,468 square feet. (Ptf's Ex 1 at 29.) Both Schaffner and Merwin testified that Plaintiff applied for and received a conditional use permit in Spring 2010 that lasts for two years. The permit does not allow recreational vehicle parking or *Page 3 
other uses of the excess land; use of the excess land is restricted to future development. (Ptf's Ex 1 at 9.) Schaffner and Merwin testified that, because of the conditional use permit, no economic use of the excess land is feasible at this time. Merwin testified that, by Spring 2012, Plaintiff will either have to build on the excess land or apply for another permit. Merwin testified that it is unlikely that the new buildings will be constructed by Spring 2012; Plaintiff has no need to build more units because of the high vacancy rate affecting the existing units.
Schaffner valued the excess land based on three comparable sales and one listing "all located in Springfield and in the general vicinity of the subject property[.]" (Ptf's Ex 1 at 29, 30.) The price per square foot of Schaffner's comparable sales and listing ranged from $2.95 per square foot for a sale that occurred in May 2008 to $3.70 per square foot for a sale that occurred in March 2008. (Id.) Schaffner stated that "a value in the upper end of the range is warranted" for the subject property and concluded a price of $3.75 per square foot, for a total value of $230,000, rounded. (Id. at 29-30.) Schaffner testified that he "wouldn't quibble" about the value of the excess land and does not consider it to be an issue in this case. Sohm estimated value of the excess land to be $246,000, rounded, based on the price per square foot of $4.00 that he determined under his cost approach. (Def's Ex A at 18.)
B. Cost Approach
Schaffner testified that he did not undertake a cost approach because the subject property was completed in phases and at a time when construction costs were significantly higher than at the date of valuation. Schaffner testified that the cost of constructing the project was significantly greater than the market value of the resulting project and that the subject property is *Page 4 
affected by severe economic obsolescence. Sohm testified that he used the cost approach because the subject property is a new property and that one reason to use the cost approach is precisely because the property is new and has not "achieved a stabilized occupancy."
Sohm determined a site value under the cost approach based on three comparable sales in the Eugene-Springfield area that occurred in March 2006, June 2006, and March 2008. (Def's Ex A at 12.) The adjusted price per square foot of those sales ranged from $2.64 to $4.64. (Id.) Sohm determined a value of $4.00 per square foot, or $980,986. (Id.) Noting that "[t]he subject site also has basic site development that is superior to raw land sales[,]" Sohm included a "cost of $1.00 per square foot for [those] modifications to the bare land[,]" or $245,242, for a total site value of $1,226,000, rounded. (Id. at 13.)
Sohm testified that he calculated an improvements replacement cost of $3,255,199 using national cost figures supplied by the Marshall Valuation Service rather than actual cost data. (Def's Ex A at 13-14.) To that value, he added entrepreneurial profit and overhead at 10 percent, or $325,520, for a total replacement cost of $3,580,719. (Id. at 14.) He then subtracted physical depreciation in the amount of $35,807, for a depreciated replacement cost of $3,544,912. (Id. at 14-15.) Finally, he added the site value of $1,226,000, for a total value under the cost approach of $4,771,000. (Id. at 15.)
C. Income Approach
Schaffner testified that the parties agree "to the dollar" regarding annual rent. Schaffner reported potential gross income of the subject property to be $683,186. (Ptf's Ex 1 at 22.) Sohm reported potential gross income to be $686,940.[1] (Def's Ex A at 21.) *Page 5 
1. Vacancy and Credit Loss
Schaffner testified that, as of January 1, 2009, the physical occupancy of the subject property was approximately 43 percent and the "economic occupancy" was approximately 29 percent.[2]
(Ptf's Ex 1 at 18.) As of March 2010, the subject property had achieved a physical occupancy of 50.7 percent and an economic occupancy of 34 percent. (Id. at 18.) Schaffner testified that the subject property has never achieved occupancy greater than 56 or 57 percent. Merwin confirmed the physical occupancy rates reported by Schaffner, testifying that, as of January 1, 2009, the physical occupancy of the subject property was 42.5 percent; as of January 1, 2010, the physical occupancy was 48.5 percent; and, as of January 1, 2011, the physical occupancy was 55.3 percent. (Ptf's Rebuttal Ex 1 at 1-3.) Merwin testified that, over a two year period (2009-11), occupancy increased by about 13 percent. Schaffner used an occupancy of 65 percent in his appraisal and testified that that is an appropriate stabilized occupancy for the subject property as of January 1, 2009.
Schaffner estimated that the economic occupancy of the subject property is less than its physical occupancy due to a promotion available to new customers[3] and due to delinquencies, which occur when a tenant fails to pay rent. Merwin could not estimate the number of units affected by the promotion at any given time; he testified that, for some months, there are 10 to 15 new move-ins and, in other months, there are 30 to 35 new move-ins. Merwin testified that, nationally, the average tenant stays in a unit for approximately five or five and one-half months. *Page 6 
Schaffner testified that he surveyed properties, including the subject property, within a 2.5 mile radius of the subject property. (Ptf's Ex 1 at 22.) His appraisal report included the occupancy rates as of January 1, 2009, for seven of the eight properties he identified within 2.5 miles of the subject property; those rates ranged from 15 to 82 percent. (Id. at 12-22.) The 15 percent occupancy rate is associated with "Comparable 8," which "was completed in November 2008 and is still in the absorption period." (Id. at 19.) New units were added to Comparables 1 and 4 in 2007; those units reported occupancy of 67 percent and 63 percent, respectively. (Id. at 12, 15.) Comparables 5 (constructed in 1991) and 6 (constructed in 1988) reported occupancy of 74 percent and 72 percent, respectively. (Id. at 16, 17.) Schaffner testified at trial that the other properties near the subject property currently report a similar discrepancy between physical and economic occupancy. (Id. at 22.) He testified that, due to overbuilding in market area, virtually every unit in the area is rented on a "rent 2 months, get one free" basis.
Schaffner testified concerning 2009 and 2010 market data from the Self Storage Almanac (Almanac), which is an annual publication by the self-storage industry that provides national and regional occupancy statistics for mini warehouses. Schaffner testified that, according to the 2009 Almanac, "the average economic occupancy for facilities in the Pacific Region was 84.0%. The occupancy for facilities having 75,000 to 100,000 square feet was 72.8%." (Ptf's Ex 1 at 23.) Schaffner testified that, according to the Almanac, the average amount of mini storage space available nationally was 7.03 square feet per capita in 2009; in Oregon, the average was 11.2 square feet per capita. Schaffner calculated that, "within the primary market area" of the subject property, there are 33.8 square feet of mini storage space per capita, which is three times the Oregon average.[4] (Id.) Schaffner testified that the square feet per capita available in the *Page 7 
subject property's market area as compared with Oregon and the nation is evidence of the excess supply in the market area and support for a long-term economic occupancy rate of 65 percent. (Id. at 23-24.) Schaffner testified that it is extremely unlikely that occupancy will ever reach Sohm's estimated occupancy of 80 percent; he estimates that it will take at least a few years to reach occupancy of 65 percent because the market is so overbuilt. (Id. at 23-24.)
Schaffner also testified concerning occupancy rates as of April 2010, as reported in the 2011 Almanac. (Ptf's Rebuttal Ex 2 at 1-3.) Based on factors including the region, rentable square feet, number of units, location type, and year built, properties similar to the subject property reported physical occupancy rates ranging from 62.5 percent to 75.7 percent and economic occupancy rates ranged from 54.1 percent to 68.7 percent. (Id.)
On rebuttal, Schaffner testified that another appraiser for Defendant agreed to a 30 percent vacancy factor at a 2009 board of property tax appeals (board) hearing involving another one of Schaffner's properties after initially presenting a 20 percent vacancy factor. Schaffner testified that that was the only instance of which he was aware that Defendant had agreed to a 30 percent vacancy factor, but that that was the only property that he appealed to the board in 2009.
Sohm testified that the Department of Revenue instructs county appraisers to value properties at stabilized occupancy. Sohm testified that
 "[s]tabilized occupancy is a level of occupancy expected when any transitory market conditions cease to exist; it reflects an occupancy level for which the property was designated and an occupancy level that is expected to continue over the economic life of the property. Stabilized occupancy may or may not reflect actual vacancy of the subject property on the valuation date."
(Def's Ex A at 9.) Sohm testified that it is important to look at the lifecycle of a property to determine its stabilized occupancy. He testified that the current market is not a reliable indicator of stabilized occupancy because of the recession. Sohm testified that the market for mini storage *Page 8 
units is "quite cyclical"; when the economy is good and the market is absorbing, vacancy factors will be as low as 10 percent. Sohm testified that, under "normal market conditions" (i.e. supply and demand are balanced), it typically takes between 18 months and two and half years to achieve stabilized occupancy, but he cannot provide an estimate for how long it will take for the subject property to reach stabilized occupancy. Sohm testified that the court should look at other properties that have achieved stabilized property to determine the value of the subject property.
Sohm testified that Defendant conducted an extensive survey in 2005 of mini storage facilities and found that the typical vacancy was 10 percent. (Id. at 21.) He testified that "[t]he present market has an over supply of units reflecting the deep recession that has impacted the area with occupancy impacts taking place subsequent to the date of value." (Id.) He testified that "[t]he information provided by the petitioner at BOPTA showed established complexes that had not recently expanded with occupancy ranging from 72% to 82%." (Id.) Based on that data, Sohm concluded "than an appropriate stabilized vacancy factor for the subject property at January 1, 2009, was 20%." (Id.) Sohm testified that subject property has good exposure due to its location and good quality buildings; it should do as well as other properties in the market once it has reached stabilized occupancy.
2. Expenses and Net Operating Income
Schaffner stated that "[t]he expenses, in this particular case, must be the estimate of long term stabilized operating expenses. Due to the fact that the subject property is still in the absorption period of its rent up the historic expenses are not judged to be appropriate for use in estimating appropriate long term expenses." (Ptf's Ex 1 at 24.) Schaffner, therefore, surveyed *Page 9 
properties in Springfield and Eugene and determined six to be comparable to the subject. (Id.) Of those, Schaffner testified that only one is located in the same market area as the subject property and was included as one of his income and occupancy comparables. (See id. at 21, 24.) He determined that cost per unit was not a reliable measure of expenses because income from other sources skewed the figures and determined expense ratios to be more appropriate in this case. (Id. at 24.) Schaffner removed property taxes from the expenses and identified expense ratios ranging from 28.5 percent to 39.1 percent, with a mean ratio of 33.1 percent. (Id. at 24-25.) Schaffner used an expense ratio of 33 percent in calculating a net operating income of $297,505. (Id. at 25.)
Sohm stated that "Kevin Howard, a prominent regional mini-warehouse owner and manager" reported that "the operating expenses for a well managed property should be approximately 32% at January 1, 2009." (Def's Ex A at 22.) Sohm reviewed the data provided by Plaintiff at the board hearing and concluded that "[t]he established complexes that reflected a stabilized level of occupancy showed 31% to 34% expenses. * * * Overall, an expense ratio at stabilized occupancy of 34% is concluded for the subject property." (Id.) Sohm testified that his expense ratio includes property taxes because that is the typical method and because "[a]ttempting to eliminate property taxes from the expense ratio and allocate property tax expense based on the effective tax rate would be difficult, as actual taxes for each of the sale properties vary as a percentage of the total. It is more appropriate to utilize the overall expense ratio including property taxes in this instance because of the data available." (Id.) Using an expense ratio of 34 percent, Sohm calculated a net operating income of $362,704. (Id.) *Page 10 
3. Capitalization Rate and Indicated Value
Schaffner estimated an overall capitalization rate of eight percent based on ten sales in Washington and Oregon that occurred between January 2008 and January 2009 indicating rates ranging from 6.89 to 8.19 percent . (Ptf's Ex 1 at 25-26.) In selecting properties, Schaffner testified that he sought out "larger properties" — that is, properties with at least 180 units or more, which typically have on-site managers and security. He added a tax rate of 0.0172705 to the eight percent capitalization rate for a total rate of 0.0972705. (Id. at 26-27). At trial, Schaffner testified that he computed the tax rate incorrectly; the tax rate should have been 0.0072747, for a capitalization rate including the tax rate of 8.72 percent. Schaffner revised his value of the mini-warehouse complex to $3,409,000, rounded. Adding the value of the excess land ($230,000), Schaffner calculated an indicated value of $3,639,000, rounded, under the income approach.
Sohm selected a capitalization rate of eight percent based on four comparable sales of properties located in Springfield or Eugene that occurred between March 2008 and January 2009, indicating rates ranging from 6.12 to 7.93 percent. (Def's Ex A at 17, 23.) Sohm considered sales 2 and 4, with capitalization rates of 7.93 and 7.70 percent, respectively, to be the most relevant in determining a capitalization rate for the subject property. (Id. at 23.) Sohm stated that his chosen capitalization rate of eight percent is slightly higher than the capitalization rates involved in sales 2 and 4 because "[i]t is acknowledged that the market perceived increased risk at January 1, 2009, even if sales had yet to reflect higher overall rates in mid-2008." (Id.) Using an eight percent capitalization rate, Sohm concluded a value of $4,533,800 for the mini-warehouse complex, to which he added the excess land value of $246,000, for a total value of $4,780,000, rounded, under the income approach. (Id.) *Page 11 
D. Sales Comparison Approach
In calculating a value under the sales comparison approach, Schaffner relied on the ten sales that he used to calculate the capitalization rate under the income approach. (Ptf's Ex 1 at 27.) Schaffner testified that "most * * * if not all" of the sales were stabilized, noting that at least one property (sale 8) "may have had some units absorbing." He found that the price per unit ranged from $5,298 to $13,447, which he noted was "an extremely wide range," rendering the comparison to the subject property "difficult and quite subjective." (Id. at 28.) He observed that "there is a direct relationship between the sale price per unit and the net operating income per unit." (Id.) For that reason, he evaluated his comparable sales based on net operating income per unit and concluded that "the subject property should have a unit value of more than $5,621 per unit and less than $7,482 per unit." (Id.) Because "valuations of most income properties weakened dramatically from early 2008 to early 2009 due to the regional and national recession and tightening lending practices" Schaffner concluded that "a value somewhat below the * * * median indication [of $6,402] is believed warranted in this case." (Id. at 28, 29.) He selected a value of $5,800 per unit for a value of $3,283,000, to which he added the excess land value, for an indicated value of $3,513,000 under the sales comparison approach. (Id. at 29, 30.)
In response to a question from Sohm, Schaffner testified that his sales comparison approach was essentially the same as his income approach because he analyzed properties based on net operating income per unit; his indicated value under the sales comparison approach would increase, therefore, due to the change in the tax rate used under his income approach. Schaffner did not provide a specific revised value under the sales comparison approach.
Sohm testified that there were no sales of properties at "the same life stage" as the subject property. He identified four comparable sales in Lane County, noting that sales 2 and 4 were the *Page 12 
better comparables. (Def's Ex A at 18.) He concluded that "the subject should command a price per unit between the adjusted $9,412 indication of Comparable 4 and the $6,375 indication of Comparable 2." (Id.) Sohm selected a value of $8,000 per unit for an indicated value under the sales comparison approach of $4,774,000, including the excess land. (Id.)
Schaffner testified that Plaintiff requests a 2009-10 real market value of $3,650,000. Sohm testified that Defendant requests a 2009-10 real market value of $4,775,000.
 II. ANALYSIS
The issue before the court is the real market value of the subject property for the 2009-10 tax year. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[5] The assessment date for the 2009-10 tax year was January 1, 2009. ORS 308.007(2); ORS 308.210. "When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.
There are three methods used to determine real market value: the cost approach, the income approach, and the sales comparison or market approach. Allen v. Dept. of Rev. (Allen),17 OTR 248, 252 (2003). All three approaches must be considered, although "it may be that all three approaches cannot be applied" for a particular property. OAR 150-308.205-(A)(2)(a). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of the approaches is a question of fact to be determined *Page 13 
by the court upon the record." Pacific Power Light Co. v. Dept.of Revenue (Pacific Power),286 Or 529, 533, 596 P2d 912 (1979).
Schaffner determined the value of the subject property using both the income approach and the market approach. He testified that he considered the income approach to be the most relevant because investors consider net operating income and capitalization rates when deciding whether to purchase a property. Sohm determined the value of the subject property using all three approaches. He noted that "the three approaches are closely supportive of one another," but noted that "[t]he data set of sales was not ideal and the indication of the sales comparison approach is given less credence." (Def's Ex A at 25.) Schaffner testified at trial that the only real issue is this case is vacancy and collection loss under the income approach; that issue will determine the value of the subject property as of January 1, 2009. Sohm testified that the court should focus on the issue of stabilized occupancy.
The subject property is an income producing property, thus the court places primary emphasis on the income approach. However, the subject property is also a new property, thus the court places some emphasis on the cost approach. The court places the least emphasis on the sales comparison approach due to the lack of sales of comparable properties occurring in the subject property's market area on or around the January 1, 2009, assessment date.
Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue,4 OTR 302, 312 (1971). Plaintiff "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." Woods v. Dept. of Rev.,16 OTR 56, 59 (2002). *Page 14 
A. Cost Approach
"The cost approach is `particularly useful in valuing new or nearly new improvements.'" Magno v. Dept. of Rev.
(Magno), 19 OTR 51, 55 (2006), citing Appraisal Institute,The Appraisal of Real Estate 63." "In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." Id., citing Appraisal Institute, The Appraisal of Real Estate 63. Finding Defendant's indicated value under the cost approach to be reasonable and having received no cost evidence from Plaintiff, the court concludes that the value of the subject property under the cost approach was $4,771,000, as of January 1, 2009.
B. Excess Land Value
The parties' determined similar values for the excess land; Schaffner stated at trial that he "wouldn't quibble" over the excess land value. The court finds Defendant's value of $4.00 per square foot, determined under Sohm's cost approach, to be reasonable in this case; thus the court finds the value of the excess land to have been $245,872 as of January 1, 2009.
C. Income Approach.
"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." Allen,17 OTR at 253 (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." PacificPower, 286 Or at 540. The Oregon Supreme Court "decided that the flow of income to be determined is that which `would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]'" Pacific Power, 286 Or at 541-42, citing Mt.Bachelor v. Dept. of Rev., 273 Or 86, 539 P2d 653 (1975). *Page 15 
Both parties here relied on the direct capitalization method to determine expected future income. "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" Allen, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income."Id. at 254 (citation omitted). "To calculate the [net operating income] appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data."Id. at 254.
The parties are in agreement that the actual rental income of the subject property is the income that should be used to determine potential gross income in this case. Thus, the court finds that the potential gross income of the subject property as of January 1, 2009, was $683,186.
The parties identified the question of stabilized occupancy as of January 1, 2009, as the primary issue in this case. Both parties testified that, as of January 1, 2009, occupancy in the subject property's market area was affected by the recession and by an oversupply of units in the market area. Both parties also testified that the subject property had not reached stabilized occupancy as a January 1, 2009. Accordingly, the court looks to comparable properties and market trends to determine occupancy as of January 1, 2009.
Sohm and Schaffner used three of the same rent comparables, Schaffner's comparables 1, 5, and 6. Sohm did not indicate occupancy rates for his rent comparables; based on Schaffner's appraisal report, the occupancy rates of those properties as of January 1, 2009, were 67, 74, and 72 percent, respectively. New units were added to comparable 1 in July 2007, suggesting that that property may not have achieved stabilized occupancy as of January 1, 2009. Comparables 5 and 6 were constructed in 1991 and 1988, respectively. Based on the evidence *Page 16 
presented, the court concludes that an occupancy rate of 72 percent was appropriate as of January 1, 2009, for a vacancy allowance of $191,292 and an effective gross income of $491,894.
The court finds that Plaintiffs expense ratio of 33 percent, not including property taxes, and capitalization rate (including a tax rate) of 8.72 percent are reasonable in this case. Thus, the court concludes an indicated value for the subject mini-warehouse complex of $3,779,461. Adding to that the value of the excess land, $245,872, the court concludes a total value for the subject property under the income approach of $4,025,333, as of January 1, 2009.
D. Sales Comparison Approach
"Under the sales comparison approach, the value of a property is derived by `comparing the subject property with similar properties, called comparable sales.' That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property." Magno,19 OTR at 58 (citations omitted). Thus, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. Richardson v. Clackamas CountyAssessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). Plaintiff did not provide competent evidence of the value of the subject property under the sales comparison approach. Schaffner's indicated value under his sales comparison approach is unclear as a result of the adjustments made to his income approach. The court finds that Defendant's value of $8,000 per unit is reasonable in this case and accepts Defendant's indicated value under the sales comparison of $4,774,000 as of January 1, 2009. *Page 17 
 III. CONCLUSION
After carefully considering the evidence presented by the parties, the court concludes that the January 1, 2009 real market value of the subject property was $4,150,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 0132504 was $4,150,000, for the 2009-10 tax year.
Dated this _____ day of March 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on March 24, 2011. The Court filed and entered this documenton March 24, 2011.
[1] The slight discrepancy between reported potential gross income appears to be due to the fact that the rent figures for the subject property that Sohm used are reported in Schaffner's appraisal as the "current (5/10) monthly contract rent" figures. (Ptf s Ex 1 at 7; Def s Ex A at 21.)
[2] Sohm's appraisal report incorrectly states that the "reported occupancy" of the subject property was 67 percent as of January 1, 2009. (Def's Ex A at 21.) Sohm testified at trial that that number was an error, but that he did not rely on that number in determining the occupancy rate that he used in his income approach.
[3] The promotion did not charge rent for the third month after the first two months had been paid.
[4] Schaffner calculated that figure based on census information indicating a total population of 16,250 individuals in the market area and approximately 550,000 square feet of storage space. (Ptf's Ex 1 at 23.)
[5] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007. *Page 1